# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC NOEL,

        *Plaintiff-Appellant,*

v.

BRIAN C. HALL; SANDRA A. HALL,
aka Sandra Johnson; GABRIELLE S.
LENNARTZ; HERB WEISSER;
MICHELLE A. MERCHANT,

        *Defendants-Appellees.*

No. 06-35730

D.C. No.
CV-99-00649-
ALH/DCA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
July 9, 2008—Portland, Oregon

Filed June 12, 2009

Before: Harry Pregerson and Stephen Reinhardt,
Circuit Judges, and Lyle E. Strom,* District Judge.

Opinion by Judge Reinhardt

---

*The Honorable Lyle E. Strom, Senior United States District Judge for the District of Nebraska, sitting by designation.

## COUNSEL

Richard L. Grant, Esq., Portland, Oregon, for the appellant.

Jonathan M. Radmacher, Esq.; Trung D. Tu, Esq., McEwen Gisvold LLP, Portland, Oregon, for the appellees.

## OPINION

REINHARDT, Circuit Judge:

This is a second trip to our court for Eric Noel in his more than a decade-long feud with Sandra Hall over a $750 horse, a $5000 mobile home, and tapes of recorded telephone calls. It all started with the horse. In this unhappy chapter of the continuing saga, Noel appeals from summary judgment entered by the District Court of Oregon dismissing his case against Herb Weisser, Hall's attorney during the early part of the dispute. Noel challenges the district court's dismissal of his federal and state law claims against Weisser, as well as the denial of leave to file a fifth amended complaint that alleges RICO violations. Here, we affirm the district court's entry of summary judgment on the federal wiretap claims. In a separate memorandum disposition, we affirm the district court on all other claims, including the denial of the motion to file a fifth amended complaint.[1]

---

[1]Although we denied Weisser's Motion for Summary Dismissal of Appeal and Imposition of Sanctions Against Appellant, we note that Noel's briefs and excerpts of record were sorely deficient. For example, Noel incorporated by reference the arguments in the numerous briefs that he submitted to the district court, which is "an entirely improper way of presenting argument to this court." *Sandgathe v. Maass*, 314 F.3d 371, 380 n.8 (9th Cir. 2002); Ninth Circuit Rule 28-1(b). He also did not set forth the relevant facts in his brief. *See* Fed. R. App. P. 28(a)(7). There were other problems that complicated our review of this fact-intensive case. Counsel for Noel would be well-advised to comply with the court's rules in the future if he expects to continue to escape sanctions. The next panel may not be as empathetic.

## I. BACKGROUND[2]

Before all the lawsuits and enmity began, Sandra Hall lived and worked at the Vancouver Riding Academy, a business that Eric Noel owned and operated. In 1995 and 1996, Noel and Hall entered into two inauspicious agreements. First, in May 1995, they agreed to jointly purchase a horse named "Red Hot Prospect" for $750, train it and ready it for resale, and share equally in any profits earned. Second, around August 1996, Hall sold Noel her mobile home which was parked on the premises of the Academy. The sale price of $5000 was to be paid in full when Red was sold.

By August 1996, Hall and Noel's relationship had turned sour, and it continued to deteriorate as the two fought over the management of the horse and the ownership of the home. Then in May 1997, Hall and her husband, Brian Hall, went to the mobile home, where Noel now lived, and found a number of cassette tapes on a table and in a stereo that belonged to Hall. She played one of them and realized that the tapes contained recordings of her telephone conversations while she lived at the Academy. (*Id.*) She took the tapes and called her friend, Gabrielle Lennartz, whose conversation had also been recorded, to seek her advice. It is not clear from the record how or by what means Noel made these recordings, although both parties appear to assume that he intercepted Hall's calls and recorded her conversations on the tapes.

Immediately after hearing from Hall, Lennartz contacted Herb Weisser, an attorney. Weisser told Lennartz that the women may have federal and state wiretap claims against Noel, but that either he or she would have to listen to the tapes in their entirety and summarize them before he could evaluate the legal claim. Weisser advised Lennartz to turn over the

---

[2]We limit the background to the facts necessary to resolve the federal wiretap claims. A more complete description of the facts and the procedural posture can be found in *Noel v. Hall*, 341 F.3d 1148 (9th Cir. 2003).

original tapes to the police as evidence of a crime but to make a copy for him for purposes of pursuing a civil claim against Noel. He also suggested that she contact the other parties whose conversations had been recorded to inform them that the tapes had been made. Lennartz took his advice and listened to the tapes as she copied them, prepared a summary of the contents, delivered the tapes and the summaries to Weisser and to the Clark County Sheriff's Department, and called the recorded parties to inform them of the existence of the tapes. Noel also alleges that Lennartz disclosed the contents of the conversation to his clients and prospective employer in order to discredit him.

A number of lawsuits ensued thereafter. Of some relevance here, in the lawsuit over Red the Horse filed by Noel in the Skamania County Superior Court, Hall, represented by Weisser, filed counterclaims alleging the violation of wiretapping laws. Hall later voluntarily dismissed the counterclaims, hired William R. Brendgard as her lawyer, and filed a separate suit against Noel in state court, alleging violations of federal wiretap law under 18 U.S.C. § 2511 and state wiretapping law under section 9.73.030 of the Revised Code of Washington. She won a judgment of $2500 plus costs and attorney's fees in August 1999.

The dispute finally reached the federal courts on May 6, 1999, when Noel filed suit in the District Court of Oregon against Hall, her husband Brian, Weisser, Lennartz, and Michelle Merchant.[3] In the third amended complaint, the one being pursued in this lawsuit, he alleged the violation of federal wiretap laws, the violation of Oregon wiretap laws, loss of use of the mobile home, damage to the mobile home, damage to personal property, intentional interference with contractual relations, breach of fiduciary duty, blackmail,

---

[3]Noel alleges that Michelle Merchant, who appears to be a friend of the Halls and Lennartz, also took part in the various acts underlying his claims.

extortion, and injurious falsehood. In fact, there were few torts he failed to allege other than horse thievery. The case was appealed previously when the district court dismissed all claims against the Halls based on the doctrines of *Rooker-Feldman* and claim preclusion. On September 2, 2003, intrigued by the technical jurisdictional issues, we wrote a lengthy and learned disquisition on the *Rooker-Feldman* doctrine and reversed on that ground as well as on the ground of claim preclusion as to which our disquisition was equally learned although not as lengthy. We remanded the case to the district court affirming the dismissal of the wiretapping-related claims against Hall but reversing the dismissal of all other claims. *Noel v. Hall*, 341 F.3d 1148 (9th Cir. 2003). Thus the saga of Red the Horse survived once more and once more the federal courts became enmeshed in the petty feud between Noel and the others.

On remand, Noel sought leave to file a fifth amended complaint. Seeing light at the end of the tunnel, or at least a glimmer of light, the magistrate judge denied the motion, and the district judge overruled Noel's objections to the magistrate judge's order. The magistrate judge then recommended granting Weisser's motion for summary judgment, and the district judge adopted the recommendation and granted the motion. The district court entered a Rule 54(b) judgment in favor of Weisser on September 26, 2006. Noel again timely appealed.[4]

## II. JURISDICTION

We have jurisdiction over Noel's appeal of the federal wiretap claim pursuant to 28 U.S.C. § 1291 if we determine that the district court properly entered final judgment as to all claims against Weisser.

---

[4]Noel filed his notice of appeal prior to the entry of Rule 54(b) judgment, but the subsequent entry of judgment cured the notice's deficiency. *See Anderson v. Allstate Insurance Co.*, 630 F.2d 677, 680 (9th Cir. 1980).

**[1]** When the district court dismisses claims against one of a number of parties, it has discretion to "direct the entry of a final judgment as to [that party] . . . only if the court expressly determines that there is no just reason to delay." Fed. R. Civ. P. 54(b). Our function on appeal is to "scrutinize the district court's evaluation of such factors as the interrelationship of the claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980). If we are satisfied that such "juridical concerns" have been met, however, we accord "substantial deference" to the district court's assessment of equitable factors such as prejudice and delay. *Id.*; *see also Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797-98 (9th Cir. 1991).

**[2]** In this case, the district court expressly determined that there was no just reason for delay and directed that final judgment be entered as to all claims against Weisser.[5] This determination was proper. The summary judgment disposed of the case between Noel and Weisser, freeing Weisser from further unduly burdensome litigation. *See Alcan Aluminum Corp. v. Carlsberg Fin. Corp.*, 689 F.2d 815, 817 (9th Cir. 1982). Although similar claims remain pending against other defendants, the factual bases of many of the claims differ as to each defendant. Moreover, we have held that claims certified for appeal do not need to be separate and independent from the remaining claims, so long as resolving the claims would "streamline the ensuing litigation." *Texaco*, 939 F.2d at 798. It would do so here. As a result, Red the Horse may finally be on the path to ending his journey through the federal courts. In short, we conclude that we have jurisdiction over this appeal.

---

[5]Although the district court did not make "specific findings setting forth the reason for [granting final judgment]", we have held that lack of such findings is not a jurisdictional defect as long as we can independently determine the propriety of the order. *Alcan Aluminum Corp. v. Carlsberg Fin. Corp.*, 689 F.2d 815, 816-17 (9th Cir. 1982) (internal citations and quotation marks omitted).

## III. FEDERAL WIRETAP CLAIMS

The civil damages provision of the federal wiretap act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 et seq. ("Wiretap Act"), provides a private right of action to "any person whose wire . . . communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520. A Washington state court found Noel liable under this provision for intercepting Hall's telephone conversations and recording them on audiotapes. Noel contended before the district court that Weisser violated the same provision by directing Lennartz to listen to and copy the tapes, thus "intercept[ing]" his "wire communication," and intentionally "us[ing] and "disclos[ing]" the tapes' contents in the course of filing a lawsuit against him and in making settlement offers.[6] We review *de novo* the district court's grant of summary judgment. *See Simo v. Union of Needletrades*, 322 F.3d 602, 609 (9th Cir. 2003), *cert. denied*, 540 U.S. 873 (2003).

### A. Statutory Standing

[3] Section 2520 provides a cause of action to "any person *whose* . . . communication is intercepted, disclosed, or intentionally used." 18 U.S.C. § 2520 (emphasis added).[7] The dis-

---

[6]Noel also argues that the district judge was bound by his earlier decision denying Weisser's motion to dismiss. We have held, however, that such denials are "generally interlocutory" and "subject to reconsideration by the court at any time." *Preaseau v. Prudential Ins. Co. of America*, 591 F.2d 74, 79-80 (9th Cir. 1979) (internal quotation marks omitted) (holding that district court is not bound by an earlier denial of motion for summary judgment). The district court did not abuse its discretion here in departing from its earlier decision, "particularly in light of the correctness of its legal conclusion." *Id.*

[7]This provision stands in contrast to 18 U.S.C. § 2518(10)(a), which gives any "aggrieved person" the right to suppress evidence obtained in violation of the wiretap law. The definition of "aggrieved person" is broader than "any person whose . . . communication is intercepted." Specifically, an "aggrieved person" includes "a party to any intercepted wire . . . communication" *and* "a person against whom the interception was directed." 18 U.S.C. § 2510(11).

trict court interpreted this provision to require plaintiffs to have been party to the communication in order to have standing to bring a claim. The district court thus held that Noel could bring his wiretapping claims only on the basis of recordings of conversations to which he was a party.[8]

Noel challenges the district court's ruling, arguing that he had "possessory interest" over the communication and his recordings because they were made in the course of his business. He refers us to the Sixth Circuit, which has permitted standing based on possessory interest of entities. *See Smoot v. United Transp. Union*, 246 F.3d 633, 639-41 (6th Cir. 2001) (holding that a union and a corporation had standing to sue under § 2520 for unlawful tape recordings of an executive meeting between representatives of the two entities). The Sixth Circuit recognized that this was necessary in order to give meaning to the term "any person," which includes "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6). Unless entities could sue based on "possessory interest," it would be "difficult to conceive of a corporation or association ever having standing under the Act." *Smoot*, 246 F.3d at 640. Noel, however, brings this suit as an individual.

In any event, we need not reach the question of the precise scope of statutory standing; such standing, unlike constitutional standing, is not jurisdictional. *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004). We can thus bypass the issue when, as is the case here, the plaintiff's claims would fail anyway. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 1013 n.2 (1998); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 456 (1974). We will, however, consider statutory standing in other respects *infra*.

---

[8]The record is not clear on whether the recordings included any of Noel's own conversations.

## B. Interception Claim

**[4]** Noel contends that he is entitled to damages under § 2520 because Weisser "procure[d] [a] person to intercept . . . [a] wire communication" in violation of 18 U.S.C. § 2511(1)(a) when he advised Lennartz to listen to and copy Noel's tape recordings of phone conversations. He is wrong.

The plain language and the statutory scheme require the conclusion that Lennartz did not "intercept" the original phone conversation when she listened to a tape recording of it and made a copy. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire . . . communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Such acquisition occurs "when the contents of a wire communication are captured or redirected in any way." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992). No new interception occurs when a person listens to or copies the communication that has already been captured or redirected. Any subsequent use of the recorded conversation is governed not by the prohibition on interception, but by the prohibition in § 2511(c) and (d) on the "use" and "disclos[ure]" of intercepted wire communications. As the Fifth Circuit has recognized, if such subsequent replaying of the acquired communication were a new interception, "Congress in its wisdom presumably would not have added a separate section providing a redundant section [regarding the use and disclosure of intercepted communications.]" *United States v. Turk*, 526 F.2d 654, 658 (5th Cir. 1976), *cert. denied*, 429 U.S. 823 (1976).

**[5]** In reaching this conclusion, we join a number of other circuits that have held that a replaying of tapes containing recorded phone conversations does not amount to a new interception in violation of the Wiretap Act. *See United States v. Hammond*, 286 F.3d 189, 193 (4th Cir. 2002), *cert. denied*, 537 U.S. 900 (2002); *Reynolds v. Spears*, 93 F.3d 428, 432-33 (8th Cir. 1996); *United States v. Shields*, 675 F.2d 1152, 1156

(11th Cir.), *cert. denied*, 459 U.S. 858 (1982); *Turk*, 526 F.2d at 658.[9] Although these cases involved only the replaying of recorded tapes rather than the copying of such tapes, we find no difference between the two forms of conduct. Once the initial interception has occurred, subsequent conduct is governed by the Wiretap Act's use and disclosure provisions.

Our conclusion does not undermine *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999), in which we held that voicemail messages were protected under the Wiretap Act in effect at the time, and at the time the events of this case occurred.[10] *Id.* at 1059. In *Smith*, we looked to the meaning of "wire communication," which was defined in the Act in effect at the time as "any aural transfer made in whole or in part . . . between the point of origin and the point of reception," specifically including "any electronic storage of such communication." *Id.* at 1055 (18 U.S.C. § 2510(1)). We reasoned that the communication left in a voicemail system was "wire communication" because it was an "aural transfer" made using a wire facility that was "electronic[ally] stor[ed]." *Id.* at 1058. We then concluded that the third-party's retrieval and recording of voicemail

---

[9]Because *Turk* is a case predating the 1986 amendments to the Wiretap Act, we have rejected its reasoning to the extent it could be read to define "intercept" in the Wiretap Act in effect in 1997 as requiring acquisition contemporaneous to the communication. *See United States v. Smith*, 155 F.3d 1051, 1057 n.11 (9th Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999). *Smith* does not preclude us from adopting *Turk*'s holding that interception occurs only the first time communication is captured or redirected.

[10]In 2001, Congress amended the Wiretap Act so that the definition of "wire communication" no longer specifically includes "electronic storage." *See* Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. No. 107-56, § 209, 115 Stat. 272, 283 (enacted Oct. 26, 2001); *Konop v. Hawaiian Airlines*, 302 F.3d 868, 878 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003). We do not analyze which version of the Wiretap Act should apply to this case, as Noel's argument fails whether or not "electronic storage" is specifically included in the definition of "wire communication."

messages amounted to an "interception" of that "wire communication." *Id.* at 1059.

Noel argues that listening to his audiotapes similarly amounts to an "interception" under *Smith* because the telephone conversations were in "electronic storage." There is, however, a difference between voicemail messages and Noel's tape recordings of phone conversations. As we explained in *Smith*, voicemail messages are the same as phone conversations for the purposes of the Act because they are a part of the original "aural transfer" between parties to the communication. If A divulges a secret to B on the phone, her conversation is protected; if B is not at home and A leaves the same secret on the voicemail for B to retrieve later, that message is also protected. If C records B's voicemail or A and B's phone conversation on his own audio tape, C's act would constitute an interception. The intercepted communication stored in C's audiotape, however, is not "wire communication" under the Act because it is not a part of the aural transfer between "the point of origin" and "the point of reception," including "electronic storage," *Smith*, 155 F.3d at 1055 (citing 18 U.S.C. § 2510(1)). "[E]lectronic storage is defined in relevant part as "any temporary, *intermediate* storage of a wire or electronic communication incidental to the electronic communication thereof." 18 U.S.C. § 2510(17)(A) (emphasis added).[11]

---

[11]In the alternative, "electronic storage" is "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(B). We reject Noel's attempt — which is made for the first time in front of our court — to characterize the Riding Academy as an "electronic communication service," which is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). We do not normally consider arguments not raised below. *See USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994). Although Noel contends that the magistrate judge "sua sponte" rejected this argument, "this situation does not differ significantly from the case in which a party alleges two different . . . legal theories, chooses to pursue only one at summary judgment, and then, when the first theory

Unlike voicemail which temporarily stores messages from A on its course to reaching B, C's audiotape is the result of C's interception of the communication between A and B and is not an intermediate storage for that communication.

[6] Because an individual does not "intercept" a "wire communication" by listening to or copying recorded tapes of phone conversations, we conclude that Weisser did not violate the interception provision of the Wiretap Act.[12] We note that the result that we reach provides ample protection for privacy, the "overriding congressional concern" underlying the Wiretap Act. *Gelbard v. United States*, 408 U.S. 41, 48 (1972). Although an individual cannot be held liable under the interception provision for listening to and copying a tape of a phone conversation, he or the wiretapper could still be held liable for using or disclosing the contents of the tape. We therefore turn to Noel's use and disclosure claims.

## C.  Use and Disclosure Claims

[7] Noel also contends that Weisser violated 18 U.S.C. § 2511(1)(c) and (d)'s prohibition on "intentionally disclos-[ing]" or "intentionally us[ing]" the "contents of any wire . . . communication, knowing or having reason to know that the information was obtained through the interception of a wire . . . communication in violation of this subsection." This provision protects against the dissemination of private communications that have been *unlawfully* intercepted. Because we

_____

fails on the merits, seeks to revisit the discarded theory." *Id.* at 1286. Because we do not consider this argument, we deny Noel's motion to supplement the record with evidence supporting his theory. We grant Weisser's motion to file a late opposition to Noel's motion to supplement the record.

[12]We do not consider here whether for purposes of criminal liability two or more persons involved in the arrangements for conducting the interception of the original communication may be held responsible under a conspiracy or another theory.

decided above that Lennartz did not "intercept" a wire communication by listening to and copying Noel's tapes, if Noel has any claim under these sections, it would have to be based on the dissemination of the phone conversations that he himself intercepted.

[8] Noel cannot, however, assert a claim based on his own interception of the communication. We would be required to reject any such contention either for failure to state a claim or for lack of standing. If Noel asserted that his own interception was not unlawful,[13] he could not state a claim against Weisser for using or disclosing an *unlawfully* intercepted communication. For example, if Noel met the exception in the Wiretap Act which allows a "party to the communication" to record the conversation, 18 U.S.C. § 2511(2)(d), or the exception which allows recordings of phone conversations "in the ordinary course of . . . business," § 2510(5)(a), Noel would not have violated the interception provisions of the Wiretap Act. Accordingly, these conversations would not have been recorded unlawfully, and Noel could not prevail on a claim that Weisser used or disclosed conversations that were acquired unlawfully.

[9] In the alternative, were Noel to acknowledge that he illegally intercepted the conversations, he would not have standing under the Wiretap Act to obtain damages for the use or disclosure of those conversations. Whatever the limits of standing under § 2520, it does not include standing based on conversations that the plaintiff himself illegally intercepted. As we have stated before: "the purpose of the statute is to protect persons talking on the phone from interception, so the illegal interceptor has no standing to invoke the act as a shield for his own violation." *Chandler v. Army*, 125 F.3d 1296,

---

[13]We do not consider whether Noel would be precluded from making such an assertion given the state court judgment against him on Hall's wiretapping claims. Neither party raises the question of the effect of that judgment on these proceedings.

1302 (9th Cir. 1997). The principle we stated in *Chandler* was based on congressional intent that a defendant charged with illegal interception should not be allowed to invoke the Wiretap Act to suppress the use and disclosure of materials he is accused of illegally intercepting. *See id.*; S. Rep. No. 1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2188 ("[U]se and disclosure [of illegally intercepted material] would be necessary in the investigation and prosecution of an illegal wiretapper himself."); *see also United States v. Underhill*, 813 F.2d 105, 112 (6th Cir. 1987) (holding that defendants are not entitled to suppress the illegally recorded tapes in their criminal proceedings because they waived their privacy in the conversations by causing them to be taped unlawfully). The same principle applies in the civil context. If the Wiretap Act were to be interpreted to grant standing to bring civil suit to those who illegally intercepted wire communications, the illegal wiretapper could use the Act to make it difficult for his victims to bring a civil suit against him and to threaten them and their lawyers with damages for the use and disclosure of communications that he illegally acquired. In fact, this is precisely what Noel attempts to do. We reject such an anomalous interpretation of a statute that is intended to protect the privacy of the wiretap victims. *See Gelbard*, 408 U.S. at 48; *see also Underhill*, 813 F.2d at 112 (concluding that Congress did not intend the absurd result that "the very people who committed the unlawful interceptions" be shielded by the Wiretap Act from the consequences of their wrongdoing).

[10] We hold that Noel either did not engage in illegal interception and therefore cannot state a claim that Weisser used or disclosed illegally intercepted material, or, in the alternative, that he did engage in illegal interception and has no standing to collect damages for the use or disclosure of the communications that he intercepted. In light of our conclusion, we need not reach Weisser's argument that he was entitled to a prosecution privilege or litigation privilege for his use of the recordings to bring a wiretap claim against Noel.

**IV.  CONCLUSION**

We affirm the district court's grant of summary judgment for Weisser on Noel's federal wiretap claims.

**AFFIRMED**